502 F.2d 867
 Michael T. FOSTER, Appellee,
v.
DAY & ZIMMERMANN, INC., Appellant, and Mason & Hanger-Silas
Mason Co., Inc., Appellant.
Michael T. FOSTER, Appellee,
v.
DAY & ZIMMERMANN, INC., Appellant, and Mason & Hanger-Silas
Mason Co., Inc., Appellee.
 Nos. 74-1085, 74-1124.
 United States Court of Appeals, Eighth Circuit.
 Submitted June 13, 1974.
Decided Sept. 13, 1974.
 
 Thomas K. Berg, Minneapolis, Minn., for appellant.
 Thomas F. Daley, Jr., Davenport, Iowa, for appellee.
 Before LAY, HEANEY and ROSS, Circuit Judges.
 LAY, Circuit Judge.
 
 
 1
 On July 25, 1969, the plaintiff, Michael T. Foster, received serious injuries while enrolled in the Army Reserve Officers Training Program at Ft. Benning, Georgia, when a hand grenade exploded in his hand during a training exercise. The grenade had been assembled in Texas by the defendant Day & Zimmermann, Inc. It contained a fuse manufactured by the defendant Mason & Hanger-Silas Mason Co., Inc., at their plant in Burlington, Iowa. The plaintiff filed suit in the United States District Court for the Southern District of Iowa and recovered a jury verdict against both defendants in the sum of $151,800.00. The defendants appeal the district court's denial of a judgment n.o.v. or a new trial.
 
 
 2
 The defendants charge as error (1) that the district court improperly applied the Iowa law of strict liability; (2) that the plaintiff failed to prove all of the essential elements of strict liability; (3) that the trial court improperly instructed that plaintiff could recover under the doctrine of res ipsa loquitur; and (4) that the defendants were not liable since they were entitled to the defense of governmental immunity.
 
 
 3
 We affirmed the judgment of the district court.
 
 Choice of Iowa Law
 
 4
 The district court determined that the state of Iowa, the state where the grenade fuse had been manufactured, had the most significant relationship to the parties and the litigation. It therefore applied the doctrine of strict liability. The defendants urge that Georgia, the state of injury, has the most relevant contact. Georgia does not apply strict liability.[1] See Whitaker v. Harvell-Kilgore Corp., 418 F.2d 1010 (5th Cir. 1969).
 
 
 5
 The district court was bound in this diversity case to apply the Iowa law of conflict of laws. Klaxon Co. v. Stentor Electric Mfg. Co., 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). The Supreme Court of Iowa has consistently adhered to the significant relationships concept in conflict of law cases. See Berghammer v. Smith, 185 N.W.2d 226 (Iowa 1971); Fuerste v. Bemis, 156 N.W.2d 831 (Iowa 1968); Flogel v. Flogel, 257 Iowa 547, 133 N.W.2d 907 (1965). In Fabricius v. Horgen, 257 Iowa 268, 132 N.W.2d 410 (1965), the Iowa Supreme Court adopted as controlling the list of relevant contacts set forth in the Restatement:
 
 
 6
 (2) Important contacts that the forum will consider in determining the state of most significant relationship include:
 
 
 7
 (a) the place where the injury occurred,
 
 
 8
 (b) the place where the conduct occurred,
 
 
 9
 (c) the domicil, nationality, place of incorporation and place of business of the parties, and
 
 
 10
 (d) the place where the relationship, if any, between the parties is centered.
 
 
 11
 (3) In determining the relative importance of the contracts, the forum will consider the issues, the character of the tort, and the relevant purposes of the tort rules of the interested states.
 
 
 12
 Id. at 414, citing Restatement (Second) Conflict of Laws, Tentative Draft No. 9 379.
 
 
 13
 The district court noted that five states have arguably relevant contacts with this litigation. The accident and injury occurred on a military reservation in Georgia. The allegedly defective fuse was manufactured in Iowa, the forum state, while the grenade was assembled in Texas. The plaintiff resided in the state of Washington at the time of his injury but lived in Oregon at the time of trial. On the relative strength of these contacts, the district court ruled that Iowa law should be applied since Iowa was the forum state and the fuse had been manufactured there. In discarding the relevancy of the place of injury, the court observed:
 
 
 14
 Because of the nature of the product and the place of its use, most of the reasons given for applying the lex locidelicti do not apply here. This particular product, used only for army training, poses no danger to the general population of Georgia; the state has no burden of hospitalization or treatment of persons injured by its use; and the users of this product in Georgia will more than likely be residents of other states. Under these particular circumstances Georgia has little interest in the outcome of this litigation.
 
 
 15
 We agree that under the facts presented, Georgia has little if any contact with or interest in the parties or in the subject matter of this litigation. The fact that Iowa is the forum state, at least under the Restatement rule, is not a factor deemed relevant to the test. We hold that Iowa, as the state of manufacture, has an interest in this litigation which outweighs any entertained by the state of Georgia.[2] We therefore conclude that the law of Iowa was properly applied.
 
 Sufficiency of Evidence: Strict Liability
 
 16
 The defendants urge that, even if Iowa law is controlling, it was not proper to apply strict liability under the facts present here. Their argument is based upon their belief that neither the fuse nor the grenade in question were placed in the stream of commerce since they were manufactured exclusively for and on behalf of the United States Government. Thus, they urge, one of the primary justifications for the doctrine of strict liability, that of the public's interest in ensuring that only safe products are placed in the stream of commerce, is absent.
 
 
 17
 In adopting strict liability in 1970, the Iowa Supreme Court quoted with approval the following passage from Suvada v. White Motor Co., 32 Ill.2d 612, 210 N.E.2d 182 (1965):
 
 
 18
 It seems obvious that public interest in human life and health, the invitations and solicitations to purchase the product and the justice of imposing the loss on the one creating the risk and reaping the profit are present and as compelling in cases involving motor vehicles and other products, where the defective condition makes them unreasonably dangerous to the user, as they are in food cases.
 
 
 19
 Hawkeye-Security Ins. Co. v. Ford Motor Co., 174 N.W.2d 672, 684 (Iowa 1970).
 
 
 20
 In making the grenade and its component parts the defendants knew that it was made for military personnel and that it was to be used by them. We believe the public interest in human life and health requires the protection of the law against the manufacture of defective explosives, whether they are to be used by members of the public at large or members of the public serving in our armed forces. It is true that the defendants here did not solicit the use of their product, yet they most certainly did reap the profits from its production. When these factors are considered together, the defendants' argument is unpersuasive.
 
 
 21
 The defendants also urge that to be liable under the law of strict liability as contained in 402(a) of the Restatement (Second) of Torts, they must 'sell' their product. Here, they say, they did not purchase the raw materials which went into their products but rather assembled them from materials and according to specifications provided by the government. Thus, it is urged, they did not sell a product but a service. We likewise reject this argument. Section 402(a) of the Restatement (Second) of Torts makes the principles of strict liability applicable to 'any person engaged in the business of selling products for use or consumption.' Restatement (Second) of Torts, 402(a), Comment f. The defendants were paid for each fuse and each grenade produced. They clearly were within the chain of distribution of a product supplied for use and consumption by others. We believe this is all that is required.
 
 
 22
 In Delaney v. Towmotor Corp., 339 F.2d 4 (2d Cir. 1964), the Second Circuit was presented with a non-sale situation. There, a manufacturer supplied a forklift to another for demonstration purposes. When the plaintiff was injured, the defendant argued against the application of strict liability on the ground that he was a bailor, not a seller. The court said:
 
 
 23
 We realize that the latest version of the section of the Restatement of Torts Second dealing with a manufacturer's liability, 402A(1) (Tent. Draft No. 10, 1964), speaks of 'one who sells any product in a defective condition * * *.' But we think the Court of Appeals would regard this, as we would, as a description of the situation that has most commonly arisen rather than as a deliberate limitation of the principle to cases where the product has been sold, intentionally excluding instances where a manufacturer has placed a defective article in the stream of commerce by other means. We can see no sensible reason why Delaney's rights against Towmotor should be less extensive on the facts here than if Towmotor had first sold the hilo to its distributor, or than if it had sold the machine to Hogan, for a nominal down payment, subject to return if Hogan was not satisfied after a trial period.
 
 
 24
 Id. at 6.
 
 
 25
 Whether the manufacturer 'sells' his product in the normal sense of that word, leases it, or supplies it for a sole purchaser under contractual arrangements such as those present here, the policy considerations involving the doctrine of strict liability remain the same.[3]
 
 Res Ipsa Loquitur
 
 26
 The defendants also urge that the trial court erred by instructing the jury that the plaintiff could recover on the alternative theory of res ipsa loquitur. Defendants contend that (1) the plaintiff failed to demonstrate that the defendants had exclusive control of the instrumentality which caused the injury, and (2) the plaintiff failed to discount other probable causes for the accident.
 
 
 27
 The trial court submitted the following instruction to the jury on the issue of exclusive control:
 
 
 28
 It is not necessary that the instrumentality or object be under the exclusive control of the defendant at the time injury or damage was sustained, provided that you find that there was no change in the condition of the grenade or fuse after the time they left each of the defendants' plants.
 
 
 29
 The defendants do not question this instruction. They urge, however, that the evidence did not support a finding that there was no change in condition after the fuse and grenade left the defendants' respective plants. In Thompson v. Burke Engineering Sales Co., 252 Iowa 146, 106 N.W.2d 351 (Iowa 1960), the Iowa Supreme Court cited with approval Escola v. Coca-Cola Bottling Co., 24 Cal.2d 453, 150 P.2d 436 (1944), where the California Supreme Court said:
 
 
 30
 It is not necessary, of course, that plaintiff eliminate every remote possibility of injury to the bottle after defendant lost control, and the requirement is satisfied if there is evidence permitting a reasonable inference that it was not accessible to extraneous harmful forces and that it was carefully handled by plaintiff or any third person who may have moved or touched it. Cf. Prosser, supra, p. 300. If such evidence is presented, the question becomes one for the trier of fact (see, e.g., MacPherson v. Canada Dry Ginger Ale, Inc., 129 N.J.L. 365, 29 A.2d 868, 869), and, accordingly, the issue should be submitted to the jury under proper instructions.
 
 
 31
 Id. at 439.
 
 
 32
 We have examined the record and find that the plaintiff has met that burden here. The customary handling of fuses after they are manufactured by the Mason Company was shown as well as the manner in which grenades are handled after they are shipped by the Day & Zimmermann plant in Texas. The evidence would allow the jury to find that extreme measures were taken to ensure against any damage or tampering with the fuses or grenades after manufacture. On the basis of this evidence the jury could have properly inferred that no change in the condition of the fuses or grenades occurred after they left the possession of the defendants.
 
 
 33
 The defendants also urge that the plaintiff had the burden of excluding all other possible explanations for the injury other than the defendants' negligence. Professor Prosser has observed:
 
 
 34
 But the inference of negligence may also arise where a definite cause is known, or where the accident is more or less a mystery, with no particular cause indicated. When a gasoline filling station mysteriously explodes, many possible explanations can be suggested, but the most likely one may be negligence on the part of those in charge. The plaintiff is not required to eliminate with certainty all other possible causes or inferences, which would mean that he must prove a civil case beyond a reasonable doubt. All that is needed is evidence from which reasonable men can say that on the whole it is more likely that there was negligence associated with the cause of the event than that there was not. It is enough that the court cannot say that the jury could not reasonably come to that conclusion.
 
 
 35
 Prosser, The Law of Torts, 223 (3d ed. 1964). 94 N.W.2d 737 (1959). In that case, a sufficient evidence to create a jury question on this issue.
 
 Governmental Immunity
 
 36
 The defendants next assert that, as contract suppliers of government munitions, they are entitled to the protections of governmental immunity. They base this claim on Pumphrey v. J. A. Jones Construction Co.,250 Iowa 559, 94 N.E.2d 737 (1959). In that case, a landowner sued a contractor who had been hired by the government to construct a lock on the Mississippi River. The contractor, acting in strict compliance with his contract, used dynamite and the resulting vibrations damaged the plaintiff's property. Iowa recognizes the doctrine of liability without fault in blasting cases, but the Iowa Supreme Court held the contractor immune from suit under an extension of governmental immunity. Pumphrey, however, is not authority for the invocation of governmental immunity in this case. The court in Pumphrey made it perfectly clear that the controlling factor was the absence of fault.[4] Here, the plaintiff's claim is based on proof of the defendants furnishing a defective product. The doctrine of strict liability is not a doctrine of liability without fault. It merely removes the necessity for proving negligence.[5] The doctrine of sovereign immunity may not be extended to cover the fault of a private corporation, no matter how intimate its connection with the government. See Whitaker v. Harvell-Kilgore Corp.,418 F.2d 1010 (5th Cir. 1969).[6]
 
 The Feres Doctrine
 
 37
 Finally, the defendants argue that since the plaintiff is barred from suing the government directly under the doctrine of Feres v. United States, 340 U.S. 135, 71 S.Ct. 153, 95 L.Ed. 152 (1950), and that since the government has contractually agreed to reimburse them for any damages they may be required to pay, the plaintiff should also be barred from suing them. In Feres the Supreme Court held that the Federal Tort Claims Act did not extend to a serviceman injured while on duty.
 
 
 38
 In contrast, if here an injured serviceman reaps an indirect benefit from the government by reason of the indemnity agreement, it is because the United States has contractually consented to give it.[7] Congress could similarly give consent for the government to be sued directly by a serviceman under the Federal Tort Claims Act, but as yet has refrained from doing so. Furthermore, the government's contract here is one of indemnity. This relationship is between the government and the defendants. The plaintiff's right of recovery against these defendants cannot be so easily avoided by a contract to which the plaintiff was not a party. Contractual indemnification by the government cannot artificially create sovereign immunity. This theory was fully rejected in the Whitaker case, supra. We agree.
 
 
 39
 Judgment affirmed.
 
 
 
 [1]
 In urging the place of injury rule, defendants adopt Judge Friendly's reasoning in George v. Douglas Aircraft Co., 332 F.2d 73 (2d Cir.), cert. denied, 379 U.S. 904, 85 S.Ct. 193, 13 L.Ed.2d 177 (1964):
 Extra-state manufacturers are not entitled to have their goods enter a state on easier terms as to liability than the state establishes generally . . .. Even more clearly if a state has decided in general that persons injured within its borders . . . should not be allowed to recover . . . except for negligence, there would be little reason to accord a greater degree of protection because the chattel causing the injury was made in another state which has shown a broader concern for the general welfare of its citizens by imposing strict liability.
 Id. at 77. See 78 Harv.L.Rev. 881 (1965); see also Note, Products Liability and the Choice of Law, 78 Harv.L.Rev. 1452, 1463-64 (1965).
 
 
 [2]
 As an alternative basis for its ruling, the district court observed that, even if the relationships between Georgia and Iowa were equal, Iowa would apply 'the better rule of law.' See Fuerste v. Bemis, 156 N.W.2d 831 (Iowa 1968). Here, the court felt that would mean the imposition of strict liability. We agree. The adoption of the law of strict tort liability in Iowa, as in all states, was a recognition of those policy considerations summarized by the court in Hawkeye-Security Ins. Co. v. Ford Motor Co., 174 N.W.2d 672 (Iowa 1970):
 'The purpose of such liability is to insure that the costs of injuries resulting from defective products are borne by the manufacturers that put such products on the market rather than by the injured persons who are powerless to protect themselves. Sales warranties serve this purpose fitfully at best. * * *'
 Id. at 683, citing Greenman v. Yuba Power Products, Inc., 59 Cal.2d 57, 27 Cal.Rptr. 697, 700, 377 P.2d 897, 900 (1963).
 
 
 [3]
 For other 'non-sale' situations see, e.g., Stewart v. Budget Rent-A-Car Corp., 52 Haw. 71, 470 P.2d 240 (1970) (leased automobile); Bachner v. Pearson, 479 P.2d 319 (Alaska 1970) (leased airplane); McClaflin v. Bayshore Equipment Rental Co., 274 Cal.App.2d 446, 79 Cal.Rptr. 337 (1969) (lessor of defective stepladder); Price v. Shell Oil Co., 2 Cal.3d 245, 85 Cal.Rptr. 178, 466 P.2d 722 (1970) (lessor of gasoline tank truck); Perfection Paint & Color Co. v. Konduris, 258 N.E.2d 681 (Ind.App.1970) (paint supplier gave lacquer remover to customer to remove defective paint supplied by defendant). And see generally cases discussed by Frumer & Friedman, Products Liability, 16A(4)(b) at 264 et seq
 
 
 [4]
 The Iowa court said:
 The rule is thus stated in 43 Am.Jur., Public Works and Contracts, Section 83, pages 827, 828: 'As a general rule, a private contractor in the construction of a public improvement under a contract with duly authorized public authorities is not liable for any injury, direct or consequential, to owners of private property that may result as a necessary incident from the prosecution of the work in a proper manner, which would otherwise be a nuisance. The theory is that one who contracts with a public body for the performance of public work is entitled to share the immunity of the public body from liability for incidental injuries necessarily involved in the performance of the contract, where he is not guilty of negligence. In other words, when the act or failure to act which causes an injury is one which the contractor was employed to do and the injury results not from a negligent manner of doing the work, but from the performance thereof, the contractor is entitled to share the immunity from liability which the public enjoys * * *'. See also 69 A.L.R. 489, Annotation, and Los Angeles Dredging Company v. City of Long Beach, 210 Cal. 348, 291 P. 839, 843, 71 A.L.R. 161.
 Id. at 742.
 
 
 [5]
 The government's specifications did not call for the defendants to assemble a defectively made grenade. We observed in Passwaters v. General Motors Corp., 454 F.2d 1270 (8th Cir. 1972):
 Often the concept of strict liability is confused with liability that is absolute. Such confusion is understandable when one compares older editions of tort casebooks. The indexes of such books use the heading of 'Strict Liability' in reference to cases dealing with absolute liability, e.g., Fletcher v. Rylands, 3 Hurl. & C. 774, L.R. 3 H.L. 330 (1868). See F. Bohlen, Cases on Torts, 634 (4 Ed. 1941).
 'Some quibbler may allege that this is liability without fault. It is not. As made clear above, a plaintiff relying upon the rule must prove a defect attributable to the manufacturer and causal connection between that defect and the injury or damage of which he complains. When able to do that, then and only then may be recover against the manufacturer of the defective product.' Piercefield v. Remington Arms Co., 375 Mich. 85, 133 N.W.2d 129, 135 (1965).
 Id. at 1277 n. 7.
 
 
 [6]
 Even government-created corporations are not immune from suit unless expressly so created. In Keifer & Keifer v. Reconstruction Finance Corp., 306 U.S. 381, 59 S.Ct. 516, 83 L.Ed. 784 (1939), the Supreme Court said:
 The starting point of inquiry is the immunity from unconsented suit of the government itself. As to the states, legal irresponsibility was written into the Eleventh Amendment; as to the United States, it is derived by implication. Monaco v. Mississippi, 292 U.S. 313, 321 (54 S.Ct. 745, 747, 78 L.Ed. 1282). For present purposes it is academic to consider whether this exceptional freedom from legal responsibility rests on the theory that the United States is deemed the institutional descendant of the Crown, enjoying its immunity but not its historic prerogatives, cf. Langford v. United States, 101 U.S. 341, 343 (25 L.Ed. 1010), or on a metaphysical doctrine 'that there can be no legal right as against the authority that makes the law on which the right depends.' Kawananakoa v. Polyblank, 205 U.S. 349, 353 (27 S.Ct. 526, 527, 51 L.Ed. 834). But because the doctrine gives the government a privileged position, it has been appropriately confined.
 Therefore, the government does not become the conduit of its immunity in suits against its agents or instrumentalities merely because they do its work. United States v. Lee, 106 U.S. 196, 213, 221 (1 S.Ct. 240, 254, 261, 27 L.Ed. 171); Sloan Shipyards v. U.S. Fleet Corp., 258 U.S. 549, 567 (42 S.Ct. 386, 388, 66 L.Ed. 762). For more than a hundred years corporations have been used as agencies for doing work of the government. Congress may create them 'as appropriate means of executing the powers of government, as, for instance, . . . a railroad corporation for the purpose of promoting commerce among the states.' Luxton v. North River Bridge Co., 153 U.S. 525, 529 (14 S.Ct. 891, 892, 38 L.Ed. 808). But this would not confer on such corporations legal immunity . . ..
 Id. at 388-389, 59 S.Ct. at 517.
 
 
 [7]
 We note here, as in Whitaker, the contract between the government and Day & Zimmermann also requires the latter to carry liability insurance. The possible overall effect of this obligation on the indemnity relationship is not before us